BOARD OF EDUCATION, ISLAND TREES UNION FREE SCHOOL DISTRICT NO. 26, ET AL. *v.* PICO, BY HIS NEXT FRIEND PICO, ET AL.

No. 80–2043. Argued March 2, 1982—Decided June 25, 1982

JUSTICE BRENNAN, joined by JUSTICE MARSHALL and JUSTICE STEVENS, concluded:

1. The First Amendment imposes limitations upon a local school board's exercise of its discretion to remove books from high school and junior high school libraries. Pp. 863–872.

(a) Local school boards have broad discretion in the management of school affairs, but such discretion must be exercised in a manner that comports with the transcendent imperatives of the First Amendment. Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503, 506, and such rights may be directly and sharply implicated by the removal of books from the shelves of a school library. While students' First Amendment rights must be construed "in light of the special characteristics of the school environment," *ibid.*, the special characteristics of the school *library* make that environment especially appropriate for the recognition of such rights. Pp. 863–869.

(b) While petitioners might rightfully claim absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values in schools, petitioners' reliance upon that duty is misplaced

where they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom into the school library and the regime of voluntary inquiry that there holds sway. P. 869.

(c) Petitioners possess significant discretion to determine the content of their school libraries, but that discretion may not be exercised in a narrowly partisan or political manner. Whether petitioners' removal of books from the libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. Local school boards may not remove books from school libraries simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 642. If such an intention was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution. Pp. 869–872.

2. The evidentiary materials before the District Court must be construed favorably to respondents, given the procedural posture of this case. When so construed, those evidentiary materials raise a genuine issue of material fact as to whether petitioners exceeded constitutional limitations in exercising their discretion to remove the books at issue from their school libraries. Respondents' allegations, and some of the evidentiary materials before the District Court, also fail to exclude the possibility that petitioners' removal procedures were highly irregular and ad hoc—the antithesis of those procedures that might tend to allay suspicions regarding petitioners' motivation. Pp. 872–875.

JUSTICE BLACKMUN concluded that a proper balance between the limited constitutional restriction imposed on school officials by the First Amendment and the broad state authority to regulate education, would be struck by holding that school officials may not remove books from school libraries for the *purpose* of restricting access to the political ideas or social perspectives discussed in the books, when that action is motivated simply by the officials' disapproval of the ideas involved. Pp. 879–882.

JUSTICE WHITE, while agreeing that there should be a trial to resolve the factual issues, concluded that there is no necessity at this point for discussing the extent to which the First Amendment limits the school board's discretion to remove books from the school libraries. Pp. 883–884.

BRENNAN, J., announced the judgment of the Court and delivered an opinion, in which MARSHALL and STEVENS, JJ., joined and in all but Part II–A(1) of which BLACKMUN, J., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 875. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 883. BURGER, C. J., filed a

dissenting opinion, in which POWELL, REHNQUIST, and O'CONNOR, JJ., joined, *post,* p. 885. POWELL, J., filed a dissenting opinion, *post,* p. 893. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL, J., joined, *post,* p. 904. O'CONNOR, J., filed a dissenting opinion, *post,* p. 921.

*George W. Lipp, Jr.,* argued the cause for petitioners. With him on the briefs was *David S. J. Rubin.*

*Alan H. Levine* argued the cause for respondents. With him on the brief were *Steven R. Shapiro, Burt Neuborne, Alan Azzara, Bruce J. Ennis, Jr.,* and *Charles S. Sims.**

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion, in which JUSTICE MARSHALL and JUSTICE STEVENS joined, and in which JUSTICE BLACKMUN joined except for Part II–A–(1).

The principal question presented is whether the First Amendment[1] imposes limitations upon the exercise by a local

---

*Briefs of *amici curiae* urging reversal were filed by *Bruce A. Taylor* for Charles H. Keating, Jr., et al.; and by *David Crump* for the Legal Foundation of America.

Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll, Marsha Berzon, Laurence Gold,* and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations et al.; by *Don H. Reuben* and *James A. Klenk* for the American Library Association et al.; by *Harold P. Weinberger, Justin J. Finger,* and *Jeffrey P. Sinensky* for the Anti-Defamation League of B'Nai B'Rith; by *R. Bruce Rich* for the Association of American Publishers, Inc., et al.; by *Irwin Karp* for the Authors League of America, Inc.; by *Robert M. Weinberg, Michael H. Gottesman,* and *David Rubin* for the National Education Association; by *James R. Sandner, Jeffrey S. Karp,* and *Elizabeth A. Truly* for New York State United Teachers; and by *Jerry Simon Chasen* and *Marcia B. Paul* for P. E. N. American Center.

Briefs of *amici curiae* were filed by *Nathan Z. Dershowitz* and *Edward Labaton* for the American Jewish Congress et al.; and by *Whitney North Seymour, Jr.,* and *Martha L. Wolfe* for the Long Island Library Association Coalition.

[1] The Amendment provides in pertinent part that "Congress shall make no law . . . abridging the freedom of speech, or of the press." It applies to

school board of its discretion to remove library books from high school and junior high school libraries.

I

Petitioners are the Board of Education of the Island Trees Union Free School District No. 26, in New York, and Richard Ahrens, Frank Martin, Christina Fasulo, Patrick Hughes, Richard Melchers, Richard Michaels, and Louis Nessim. When this suit was brought, Ahrens was the President of the Board, Martin was the Vice President, and the remaining petitioners were Board members. The Board is a state agency charged with responsibility for the operation and administration of the public schools within the Island Trees School District, including the Island Trees High School and Island Trees Memorial Junior High School. Respondents are Steven Picò, Jacqueline Gold, Glenn Yarris, Russell Rieger, and Paul Sochinski. When this suit was brought, Pico, Gold, Yarris, and Rieger were students at the High School, and Sochinski was a student at the Junior High School.

In September 1975, petitioners Ahrens, Martin, and Hughes attended a conference sponsored by Parents of New York United (PONYU), a politically conservative organization of parents concerned about education legislation in the State of New York. At the conference these petitioners obtained lists of books described by Ahrens as "objectionable," App. 22, and by Martin as "improper fare for school students," *id.*, at 101.[2] It was later determined that the High School library contained nine of the listed books, and that another listed book was in the Junior High School library.[3] In

---

the States by virtue of the Fourteenth Amendment. *Gitlow* v. *New York*, 268 U. S. 652, 666 (1925); *Grosjean* v. *American Press Co.*, 297 U. S. 233, 244 (1936).

[2] The District Court noted, however, that petitioners "concede that the books are not obscene." 474 F. Supp. 387, 392 (EDNY 1979).

[3] The nine books in the High School library were: Slaughter House Five, by Kurt Vonnegut, Jr.; The Naked Ape, by Desmond Morris; Down These Mean Streets, by Piri Thomas; Best Short Stories of Negro Writers, edited

February 1976, at a meeting with the Superintendent of Schools and the Principals of the High School and Junior High School, the Board gave an "unofficial direction" that the listed books be removed from the library shelves and delivered to the Board's offices, so that Board members could read them.[4]  When this directive was carried out, it became publicized, and the Board issued a press release justifying its action.  It characterized the removed books as "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy," and concluded that "[i]t is our duty, our moral obligation, to protect the children in our schools from this moral danger as surely as from physical and medical dangers."  474 F. Supp. 387, 390 (EDNY 1979).

A short time later, the Board appointed a "Book Review Committee," consisting of four Island Trees parents and four members of the Island Trees schools staff, to read the listed books and to recommend to the Board whether the books should be retained, taking into account the books' "educational suitability," "good taste," "relevance," and "appropriateness to age and grade level."  In July, the Committee

---

by Langston Hughes; Go Ask Alice, of anonymous authorship; Laughing Boy, by Oliver LaFarge; Black Boy, by Richard Wright; A Hero Ain't Nothin' But A Sandwich, by Alice Childress; and Soul On Ice, by Eldridge Cleaver.  The book in the Junior High School library was A Reader for Writers, edited by Jerome Archer.  Still another listed book, The Fixer, by Bernard Malamud, was found to be included in the curriculum of a 12th-grade literature course.  474 F. Supp., at 389, and nn. 2–4.

[4] The Superintendent of Schools objected to the Board's informal directive, noting:

"[W]e already have a policy . . . designed expressly to handle such problems.  It calls for the Superintendent, upon receiving an objection to a book or books, to appoint a committee to study them and make recommendations.  I feel it is a good policy—and it is Board policy—and that it should be followed in this instance.  Furthermore, I think it can be followed quietly and in such a way as to reduce, perhaps avoid, the public furor which has always attended such issues in the past."  App. 44.

The Board responded to the Superintendent's objection by repeating its directive "that *all copies* of the library books in question be removed from the libraries to the Board's office."  *Id.*, at 47 (emphasis in original).

made its final report to the Board, recommending that five of the listed books be retained[5] and that two others be removed from the school libraries.[6]  As for the remaining four books, the Committee could not agree on two,[7] took no position on one,[8] and recommended that the last book be made available to students only with parental approval.[9]  The Board substantially rejected the Committee's report later that month, deciding that only one book should be returned to the High School library without restriction,[10] that another should be made available subject to parental approval,[11] but that the remaining nine books should "be removed from elementary and secondary libraries and [from] use in the curriculum."  *Id.*, at 391.[12]  The Board gave no reasons for rejecting the recommendations of the Committee that it had appointed.

Respondents reacted to the Board's decision by bringing the present action under 42 U. S. C. § 1983 in the United States District Court for the Eastern District of New York. They alleged that petitioners had

> "ordered the removal of the books from school libraries and proscribed their use in the curriculum because particular passages in the books offended their social, politi-

---

[5] The Fixer, Laughing Boy, Black Boy, Go Ask Alice, and Best Short Stories by Negro Writers.  474 F. Supp., at 391, nn. 6–7.

[6] The Naked Ape and Down These Mean Streets.  474 F. Supp., at 391, n. 8.

[7] Soul On Ice and A Hero Ain't Nothin' But A Sandwich.  474 F. Supp., at 391, n. 9.

[8] A Reader for Writers.  474 F. Supp., at 391, n. 11.  The reason given for this disposition was that all members of the Committee had not been able to read the book.  *Id.*, at 391.

[9] Slaughter House Five.  474 F. Supp., at 391, n. 10.

[10] Laughing Boy.  474 F. Supp., at 391, n. 12.

[11] Black Boy.  474 F. Supp., at 391, n. 13.

[12] As a result, the nine removed books could not be assigned or suggested to students in connection with school work.  *Id.*, at 391.  However, teachers were not instructed to refrain from discussing the removed books or the ideas and positions expressed in them.  App. 131.

cal and moral tastes and not because the books, taken as a whole, were lacking in educational value." App. 4.

Respondents claimed that the Board's actions denied them their rights under the First Amendment. They asked the court for a declaration that the Board's actions were unconstitutional, and for preliminary and permanent injunctive relief ordering the Board to return the nine books to the school libraries and to refrain from interfering with the use of those books in the schools' curricula. *Id.*, at 5–6.

The District Court granted summary judgment in favor of petitioners. 474 F. Supp. 387 (1979). In the court's view, "the parties substantially agree[d] about the motivation behind the board's actions," *id.*, at 391—namely, that

"the board acted not on religious principles but on its conservative educational philosophy, and on its belief that the nine books removed from the school library and curriculum were irrelevant, vulgar, immoral, and in bad taste, making them educationally unsuitable for the district's junior and senior high school students." *Id.*, at 392.

With this factual premise as its background, the court rejected respondents' contention that their First Amendment rights had been infringed by the Board's actions. Noting that statutes, history, and precedent had vested local school boards with a broad discretion to formulate educational policy,[13] the court concluded that it should not intervene in "'the daily operations of school systems'" unless "'basic constitutional values'" were "'sharply implicate[d],'"[14] and deter-

---

[13] 474 F. Supp., at 396–397, citing *Presidents Council, District 25* v. *Community School Board No. 25*, 457 F. 2d 289 (CA2 1972); *James* v. *Board of Education*, 461 F. 2d 566, 573 (CA2 1972); *East Hartford Educational Assn.* v. *Board of Education*, 562 F. 2d 838, 856 (CA2 1977) (en banc).

[14] 474 F. Supp., at 395, quoting *Presidents Council, District 25* v. *Community School Board No. 25, supra*, at 291 (in turn quoting *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968)).

mined that the conditions for such intervention did not exist in the present case. Acknowledging that the "removal [of the books] . . . clearly was content-based," the court nevertheless found no constitutional violation of the requisite magnitude:

> "The board has restricted access only to certain books which the board believed to be, in essence, vulgar. While removal of such books from a school library may . . . reflect a misguided educational philosophy, it does not constitute a sharp and direct infringement of any first amendment right." *Id.*, at 397.

A three-judge panel of the United States Court of Appeals for the Second Circuit reversed the judgment of the District Court, and remanded the action for a trial on respondents' allegations. 638 F. 2d 404 (1980). Each judge on the panel filed a separate opinion. Delivering the judgment of the court, Judge Sifton treated the case as involving "an unusual and irregular intervention in the school libraries' operations by persons not routinely concerned with such matters," and concluded that petitioners were obliged to demonstrate a reasonable basis for interfering with respondents' First Amendment rights. *Id.*, at 414–415. He then determined that, at least at the summary judgment stage, petitioners had not offered sufficient justification for their action,[15] and concluded that respondents "should have . . . been offered an opportunity to persuade a finder of fact that the ostensible justifications for [petitioners'] actions . . . were simply pretexts for the suppression of free speech." *Id.*, at 417.[16] Judge New-

---

[15] After criticizing "the criteria for removal" employed by petitioners as "suffer[ing] from excessive generality and overbreadth," and the procedures used by petitioners as "erratic, arbitrary and free-wheeling," Judge Sifton observed that "precision of regulation and sensitivity to First Amendment concerns" were "hardly established" by such procedures. 638 F. 2d, at 416.

[16] Judge Sifton stated that it could be inferred from the record that petitioners' "political views and personal taste [were] being asserted not in the

man concurred in the result. *Id.*, at 432–438. He viewed the case as turning on the contested factual issue of whether petitioners' removal decision was motivated by a justifiable desire to remove books containing vulgarities and sexual explicitness, or rather by an impermissible desire to suppress ideas. *Id.*, at 436–437.[17] We granted certiorari, 454 U. S. 891 (1981).

## II

We emphasize at the outset the limited nature of the substantive question presented by the case before us. Our precedents have long recognized certain constitutional limits upon the power of the State to control even the curriculum and classroom. For example, *Meyer* v. *Nebraska*, 262 U. S. 390 (1923), struck down a state law that forbade the teaching of modern foreign languages in public and private schools, and *Epperson* v. *Arkansas*, 393 U. S. 97 (1968), declared unconstitutional a state law that prohibited the teaching of the Darwinian theory of evolution in any state-supported school. But the current action does not require us to re-enter this difficult terrain, which *Meyer* and *Epperson* traversed without apparent misgiving. For as this case is presented to us, it does not involve textbooks, or indeed any books that Island

---

interests of the children's well-being, but rather for the purpose of establishing those views as the correct and orthodox ones for all purposes in the particular community." *Id.*, at 417.

[17] Judge Mansfield dissented, *id.*, at 419–432, based upon a distinctly different reading of the record developed in the District Court. According to Judge Mansfield, "the undisputed evidence of the motivation for the Board's action was the perfectly permissible ground that the books were indecent, in bad taste, and unsuitable for educational purposes." *Id.*, at 430. He also asserted that in reaching its decision "the Board [had] acted carefully, conscientiously and responsibly after according due process to all parties concerned." *Id.*, at 422. Judge Mansfield concluded that "the First Amendment entitles students to reasonable freedom of expression but not to freedom from what some may consider to be excessively moralistic or conservative selection by school authorities of library books to be used as educational tools." *Id.*, at 432.

Trees students would be required to read.[18]   Respondents do not seek in this Court to impose limitations upon their school Board's discretion to prescribe the curricula of the Island Trees schools.   On the contrary, the only books at issue in this case are *library* books, books that by their nature are optional rather than required reading.   Our adjudication of the present case thus does not intrude into the classroom, or into the compulsory courses taught there.   Furthermore, even as to library books, the action before us does not involve the *acquisition* of books.   Respondents have not sought to compel their school Board to add-to the school library shelves any books that students desire to read.   Rather, the only action challenged in this case is the *removal* from school libraries of books originally placed there by the school authorities, or without objection from them.

The substantive question before us is still further constrained by the procedural posture of this case.   Petitioners were granted summary judgment by the District Court. The Court of Appeals reversed that judgment, and remanded the action for a trial on the merits of respondents' claims. We can reverse the judgment of the Court of Appeals, and

---

[18] Four of respondents' five causes of action complained of petitioners' "resolutions ordering the removal of certain books from the school libraries of the District and prohibiting the use of those books in the curriculum." App. 5.   The District Court concluded that "respect for . . . the school board's substantial control over educational content . . . preclude[s] any finding of a first amendment violation arising out of removal of any of the books from use in the curriculum."   474 F. Supp., at 397.   This holding is not at issue here.   Respondents' fifth cause of action complained that petitioners' "resolutions prohibiting the use of certain books in the curriculum of schools in the District" had "imposed upon teachers in the District arbitrary and unreasonable restrictions upon their ability to function as teachers in violation of principles of academic freedom."   App. 6.   The District Court held that respondents had not proved this cause of action: "before such a claim may be sustained there must at least be a real, not an imagined controversy."   474 F. Supp., at 397.   Respondents have not sought review of that holding in this Court.

grant petitioners' request for reinstatement of the summary judgment in their favor, only if we determine that "there is no genuine issue as to any material fact," and that petitioners are "entitled to a judgment as a matter of law." Fed. Rule Civ. Proc. 56(c). In making our determination, any doubt as to the existence of a genuine issue of material fact must be resolved against petitioners as the moving party. *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 157–159 (1970). Furthermore, "[o]n summary judgment the inferences to be drawn from the underlying facts contained in [the affidavits, attached exhibits, and depositions submitted below] must be viewed in the light most favorable to the party opposing the motion." *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655 (1962).

In sum, the issue before us in this case is a narrow one, both substantively and procedurally. It may best be restated as two distinct questions. First, does the First Amendment impose *any* limitations upon the discretion of petitioners to remove library books from the Island Trees High School and Junior High School? Second, if so, do the affidavits and other evidentiary materials before the District Court, construed most favorably to respondents, raise a genuine issue of fact whether petitioners might have exceeded those limitations? If we answer either of these questions in the negative, then we must reverse the judgment of the Court of Appeals and reinstate the District Court's summary judgment for petitioners. If we answer both questions in the affirmative, then we must affirm the judgment below. We examine these questions in turn.

## A

### (1)

The Court has long recognized that local school boards have broad discretion in the management of school affairs. See, *e. g.*, *Meyer* v. *Nebraska, supra*, at 402; *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534 (1925). *Epperson* v. *Arkan-*

*sas, supra,* at 104, reaffirmed that, by and large, "public education in our Nation is committed to the control of state and local authorities," and that federal courts should not ordinarily "intervene in the resolution of conflicts which arise in the daily operation of school systems." *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 507 (1969), noted that we have "repeatedly emphasized . . . the comprehensive authority of the States and of school officials . . . to prescribe and control conduct in the schools." We have also acknowledged that public schools are vitally important "in the preparation of individuals for participation as citizens," and as vehicles for "inculcating fundamental values necessary to the maintenance of a democratic political system." *Ambach* v. *Norwick,* 441 U. S. 68, 76–77 (1979). We are therefore in full agreement with petitioners that local school boards must be permitted "to establish and apply their curriculum in such a way as to transmit community values," and that "there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political." Brief for Petitioners 10.[19]

At the same time, however, we have necessarily recognized that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment. In *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624 (1943), we held that under the First Amendment a student in a public school could not be compelled to salute the flag. We reasoned:

> "Boards of Education . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional

---

[19] Respondents also agree with these propositions. Tr. of Oral Arg. 28, 41.

freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Id.*, at 637.

Later cases have consistently followed this rationale. Thus *Epperson* v. *Arkansas* invalidated a State's anti-evolution statute as violative of the Establishment Clause, and reaffirmed the duty of federal courts "to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry." 393 U. S., at 104. And *Tinker* v. *Des Moines School Dist.*, *supra*, held that a local school board had infringed the free speech rights of high school and junior high school students by suspending them from school for wearing black armbands in class as a protest against the Government's policy in Vietnam; we stated there that the "comprehensive authority . . . of school officials" must be exercised "consistent with fundamental constitutional safeguards." 393 U. S., at 507. In sum, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *id.*, at 506, and therefore local school boards must discharge their "important, delicate, and highly discretionary functions" within the limits and constraints of the First Amendment.

The nature of students' First Amendment rights in the context of this case requires further examination. *West Virginia Board of Education* v. *Barnette, supra*, is instructive. There the Court held that students' liberty of conscience could not be infringed in the name of "national unity" or "patriotism." 319 U. S., at 640–641. We explained that

"the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.*, at 642.

Similarly, *Tinker* v. *Des Moines School Dist.*, *supra*, held that students' rights to freedom of expression of their political views could not be abridged by reliance upon an "undifferentiated fear or apprehension of disturbance" arising from such expression:

> "Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello* v. *Chicago*, 337 U. S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this . . . often disputatious society." 393 U. S., at 508–509.

In short, "First Amendment rights, applied in light of the special characteristics of the school environment, are available to . . . students." *Id.*, at 506.

Of course, courts should not "intervene in the resolution of conflicts which arise in the daily operation of school systems" unless "basic constitutional values" are "directly and sharply implicate[d]" in those conflicts. *Epperson* v. *Arkansas*, 393 U. S., at 104. But we think that the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library. Our precedents have focused "not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas." *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 783 (1978). And we have recognized that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Griswold* v. *Connecticut*, 381 U. S. 479, 482 (1965). In keeping with this princi-

ple, we have held that in a variety of contexts "the Constitution protects the right to receive information and ideas." *Stanley* v. *Georgia*, 394 U. S. 557, 564 (1969); see *Kleindienst* v. *Mandel*, 408 U. S. 753, 762–763 (1972) (citing cases). This right is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, in two senses. First, the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them: "The right of freedom of speech and press . . . embraces the right to distribute literature, and necessarily protects the right to receive it." *Martin* v. *Struthers*, 319 U. S. 141, 143 (1943) (citation omitted). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont* v. *Postmaster General*, 381 U. S. 301, 308 (1965) (BRENNAN, J., concurring).

More importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom. Madison admonished us:

> "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." 9 Writings of James Madison 103 (G. Hunt ed. 1910).[20]

---

[20] For a modern version of this observation, see A. Meiklejohn, Free Speech and Its Relation to Self-Government 26 (1948):

"Just so far as . . . the citizens who are to decide an issue are denied acquaintance with information or opinion or doubt or disbelief or criticism which is relevant to that issue, just so far the result must be ill-considered, ill-balanced planning, for the general good."

See also *Butler* v. *Michigan*, 352 U. S. 380, 383–384 (1957); *Procunier* v. *Martinez*, 416 U. S. 396, 408–409 (1974); *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 30 (1978) (STEVENS, J., dissenting) ("[T]he First Amendment pro-

As we recognized in *Tinker*, students too are beneficiaries of this principle:

> "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. . . . [S]chool officials cannot suppress 'expressions of feeling with which they do not wish to contend.'" 393 U. S., at 511 (quoting *Burnside* v. *Byars*, 363 F. 2d 744, 749 (CA5 1966)).

In sum, just as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members. Of course all First Amendment rights accorded to students must be construed "in light of the special characteristics of the school environment." *Tinker* v. *Des Moines School Dist.*, 393 U. S., at 506. But the special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students.

A school library, no less than any other public library, is "a place dedicated to quiet, to knowledge, and to beauty." *Brown* v. *Louisiana*, 383 U. S. 131, 142 (1966) (opinion of Fortas, J.). *Keyishian* v. *Board of Regents*, 385 U. S. 589 (1967), observed that "'students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding.'"[21] The school library is the principal locus

---

tects not only the dissemination but also the receipt of information and ideas"); *Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 862–863 (1974) (POWELL, J., dissenting) ("[P]ublic debate must not only be unfettered; it must be informed. For that reason this Court has repeatedly stated that First Amendment concerns encompass the receipt of information and ideas as well as the right of free expression").

[21] 385 U. S., at 603, quoting *Sweezy* v. *New Hampshire*, 354 U. S. 234, 250 (1957) (opinion of Warren, C. J.).

of such freedom. As one District Court has well put it, in the school library

> "a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. . . . Th[e] student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom." *Right to Read Defense Committee* v. *School Committee*, 454 F. Supp. 703, 715 (Mass. 1978).

Petitioners emphasize the inculcative function of secondary education, and argue that they must be allowed *unfettered* discretion to "transmit community values" through the Island Trees schools. But that sweeping claim overlooks the unique role of the school library. It appears from the record that use of the Island Trees school libraries is completely voluntary on the part of students. Their selection of books from these libraries is entirely a matter of free choice; the libraries afford them an opportunity at self-education and individual enrichment that is wholly optional. Petitioners might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values. But we think that petitioners' reliance upon that duty is misplaced where, as here, they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway.

### (2)

In rejecting petitioners' claim of absolute discretion to remove books from their school libraries, we do not deny that local school boards have a substantial legitimate role to play in the determination of school library content. We thus must turn to the question of the extent to which the First Amendment places limitations upon the discretion of petitioners to remove books from their libraries. In this inquiry we

enjoy the guidance of several precedents. *West Virginia Board of Education* v. *Barnette* stated:

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . . If there are any circumstances which permit an exception, they do not now occur to us." 319 U. S., at 642.

This doctrine has been reaffirmed in later cases involving education. For example, *Keyishian* v. *Board of Regents*, *supra*, at 603, noted that "the First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom;" see also *Epperson* v. *Arkansas*, 393 U. S., at 104–105. And *Mt. Healthy City Board of Ed.* v. *Doyle*, 429 U. S. 274 (1977), recognized First Amendment limitations upon the discretion of a local school board to refuse to rehire a nontenured teacher. The school board in *Mt. Healthy* had declined to renew respondent Doyle's employment contract, in part because he had exercised his First Amendment rights. Although Doyle did not have tenure, and thus "could have been discharged for no reason whatever," *Mt. Healthy* held that he could "nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Id.*, at 283–284. We held further that once Doyle had shown "that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' . . . in the Board's decision not to rehire him," the school board was obliged to show "by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.*, at 287.

With respect to the present case, the message of these precedents is clear. Petitioners rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner. If a Democratic school board, motivated by party affiliation, ordered the removal of all books

written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books. The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our Constitution does not permit the official suppression of *ideas*. Thus whether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision,[22] then petitioners have exercised their discretion in violation of the Constitution. To permit such intentions to control official actions would be to encourage the precise sort of officially prescribed orthodoxy unequivocally condemned in *Barnette*. On the other hand, respondents implicitly concede that an unconstitutional motivation would *not* be demonstrated if it were shown that petitioners had decided to remove the books at issue because those books were pervasively vulgar. Tr. of Oral Arg. 36. And again, respondents concede that if it were demonstrated that the removal decision was based solely upon the "educational suitability" of the books in question, then their removal would be "perfectly permissible." *Id.*, at 53. In other words, in respondents' view such motivations, if decisive of petitioners' actions, would not carry the danger of an official suppression of ideas, and thus would not violate respondents' First Amendment rights.

As noted earlier, nothing in our decision today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools. Because we are concerned in this case with the suppression of ideas, our holding

---

[22] By "decisive factor" we mean a "substantial factor" in the absence of which the opposite decision would have been reached. See *Mt. Healthy City Board of Ed.* v. *Doyle*, 429 U. S. 274, 287 (1977).

today affects only the discretion to *remove* books. In brief, we hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia Board of Education* v. *Barnette*, 319 U. S., at 642. Such purposes stand inescapably condemned by our precedents.

## B

We now turn to the remaining question presented by this case: Do the evidentiary materials that were before the District Court, when construed most favorably to respondents, raise a genuine issue of material fact whether petitioners exceeded constitutional limitations in exercising their discretion to remove the books from the school libraries? We conclude that the materials do raise such a question, which forecloses summary judgment in favor of petitioners.

Before the District Court, respondents claimed that petitioners' decision to remove the books "was based on [their] personal values, morals and tastes." App. 139. Respondents also claimed that petitioners objected to the books in part because excerpts from them were "anti-American." *Id.*, at 140. The accuracy of these claims was partially conceded by petitioners,[23] and petitioners' own affidavits lent further support to respondents' claims.[24] In addition, the

---

[23] Petitioners acknowledged that their "evaluation of the suitability of the books was based on [their] personal values, morals, tastes and concepts of educational suitability." App. 142. But they did not accept, and thus apparently denied, respondents' assertion that some excerpts were objected to as "anti-American." *Ibid.*

[24] For example, petitioner Ahrens stated:

"I am basically a conservative in my general philosophy and feel that the community I represent as a school board member shares that philosophy. . . . I feel that it is my duty to apply my conservative principles to the decision making process in which I am involved as a board member and

record developed in the District Court shows that when petitioners offered their first public explanation for the removal of the books, they relied in part on the assertion that the removed books were "anti-American," and "offensive to . . . Americans in general." 474 F. Supp., at 390.[25] Furthermore, while the Book Review Committee appointed by petitioners was instructed to make its recommendations based upon criteria that appear on their face to be permissible—the books' "educational suitability," "good taste," "relevance," and "appropriateness to age and grade level," App. 67—the Committee's recommendations that five of the books be retained and that only two be removed were essentially rejected by petitioners, without any statement of reasons for doing so. Finally, while petitioners originally defended their removal decision with the explanation that "these books contain obscenities, blasphemies, brutality, and perversion beyond description," 474 F. Supp., at 390, one of the books, A Reader for Writers, was removed even though it contained no such language. 638 F. 2d, at 428, n. 6 (Mansfield, J., dissenting).

---

I have done so with regard to . . . curriculum formation and content and other educational matters." *Id.*, at 21.

"We are representing the community which first elected us and re-elected us and our actions have reflected its intrinsic values and desires." *Id.*, at 27.

Petitioners Fasulo, Hughes, Melchers, Michaels, and Nessim made a similar statement that they had "represented the basic values of the community in [their] actions." *Id.*, at 120.

[25] When asked to give an example of "anti-Americanism" in the removed books, petitioners Ahrens and Martin both adverted to A Hero Ain't Nothin' But A Sandwich, which notes at one point that George Washington was a slaveholder. See A. Childress, A Hero Ain't Nothin' But A Sandwich 43 (1973); Deposition of Petitioner Ahrens 89; Deposition of Petitioner Martin 20–22. Petitioner Martin stated: "I believe it is anti-American to present one of the nation's heroes, the first President, . . . in such a negative and obviously one-sided life. That is one example of what I would consider anti-American." Deposition of Petitioner Martin 22.

Standing alone, this evidence respecting the substantive motivations behind petitioners' removal decision would not be decisive. This would be a very different case if the record demonstrated that petitioners had employed established, regular, and facially unbiased procedures for the review of controversial materials. But the actual record in the case before us suggests the exact opposite. Petitioners' removal procedures were vigorously challenged below by respondents, and the evidence on this issue sheds further light on the issue of petitioners' motivations.[26] Respondents alleged that in making their removal decision petitioners ignored "the advice of literary experts," the views of "librarians and teachers within the Island Trees School system," the advice of the Superintendent of Schools, and the guidance of publications that rate books for junior and senior high school students. App. 128–129. Respondents also claimed that petitioners' decision was based solely on the fact that the books were named on the PONYU list received by petitioners Ahrens, Martin, and Hughes, and that petitioners "did not undertake an independent review of other books in the [school] libraries." Id., at 129–130. Evidence before the District Court lends support to these claims. The record shows that immediately after petitioners first ordered the books removed from the library shelves, the Superintendent of Schools reminded them that "we already have a policy . . . designed ex-

---

[26] We have recognized in numerous precedents that when seeking to distinguish activities unprotected by the First Amendment from other, protected activities, the State must employ "sensitive tools" in order to achieve a precision of regulation that avoids the chilling of protected activities. See, e. g., Speiser v. Randall, 357 U. S. 513, 525–526 (1958); NAACP v. Button, 371 U. S. 415, 433 (1963); Keyishian v. Board of Regents, 385 U. S. 589, 603–604 (1967); Blount v. Rizzi, 400 U. S. 410, 417 (1971). In the case before us, the presence of such sensitive tools in petitioners' decisionmaking process would naturally indicate a concern on their part for the First Amendment rights of respondents; the absence of such tools might suggest a lack of such concern. See 638 F. 2d, at 416–417 (opinion of Sifton, J.).

pressly to handle such problems," and recommended that the removal decision be approached through this established channel. See n. 4, *supra*. But the Board disregarded the Superintendent's advice, and instead resorted to the extraordinary procedure of appointing a Book Review Committee—the advice of which was later rejected without explanation. In sum, respondents' allegations and some of the evidentiary materials presented below do not rule out the possibility that petitioners' removal procedures were highly irregular and ad hoc—the antithesis of those procedures that might tend to allay suspicions regarding petitioners' motivations.

Construing these claims, affidavit statements, and other evidentiary materials in a manner favorable to respondents, we cannot conclude that petitioners were "entitled to a judgment as a matter of law." The evidence plainly does not foreclose the possibility that petitioners' decision to remove the books rested decisively upon disagreement with constitutionally protected ideas in those books, or upon a desire on petitioners' part to impose upon the students of the Island Trees High School and Junior High School a political orthodoxy to which petitioners and their constituents adhered. Of course, some of the evidence before the District Court might lead a finder of fact to accept petitioners' claim that their removal decision was based upon constitutionally valid concerns. But that evidence at most creates a genuine issue of material fact on the critical question of the credibility of petitioners' justifications for their decision: On that issue, it simply cannot be said that there is no genuine issue as to any material fact.

The mandate shall issue forthwith.

*Affirmed.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

While I agree with much in today's plurality opinion, and while I accept the standard laid down by the plurality to

guide proceedings on remand, I write separately because I have a somewhat different perspective on the nature of the First Amendment right involved.

## I

To my mind, this case presents a particularly complex problem because it involves two competing principles of constitutional stature. On the one hand, as the dissenting opinions demonstrate, and as we all can agree, the Court has acknowledged the importance of the public schools "in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests." *Ambach* v. *Norwick*, 441 U. S. 68, 76 (1979). See, also, *ante*, at 863–864 (plurality opinion). Because of the essential socializing function of schools, local education officials may attempt "to promote civic virtues," *Ambach* v. *Norwick*, 441 U. S., at 80, and to "awake[n] the child to cultural values." *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954). Indeed, the Constitution presupposes the existence of an informed citizenry prepared to participate in governmental affairs, and these democratic principles obviously are constitutionally incorporated into the structure of our government. It therefore seems entirely appropriate that the State use "public schools [to] . . . inculcat[e] fundamental values necessary to the maintenance of a democratic political system." *Ambach* v. *Norwick*, 441 U. S., at 77.

On the other hand, as the plurality demonstrates, it is beyond dispute that schools and school boards must operate within the confines of the First Amendment. In a variety of academic settings the Court therefore has acknowledged the force of the principle that schools, like other enterprises operated by the State, may not be run in such a manner as to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 642 (1943). While none of these cases define the limits of a school board's au-

thority to choose a curriculum and academic materials, they are based on the general proposition that "state-operated schools may not be enclaves of totalitarianism. . . . In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503, 511 (1969).

The Court in *Tinker* thus rejected the view that "a State might so conduct its schools as to 'foster a homogeneous people.'" *Id.*, at 511, quoting *Meyer* v. *Nebraska*, 262 U. S. 390, 402 (1923). Similarly, *Keyishian* v. *Board of Regents*, 385 U. S. 589 (1967)—a case that involved the State's attempt to remove "subversives" from academic positions at its universities, but that addressed itself more broadly to public education in general—held that "[t]he classroom is peculiarly the 'marketplace of ideas'"; the First Amendment therefore "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.*, at 603. And *Barnette* is most clearly applicable here: its holding was based squarely on the view that "[f]ree public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction." 319 U. S., at 637. The Court therefore made it clear that imposition of "ideological discipline" was not a proper undertaking for school authorities. *Ibid.*

In combination with more generally applicable First Amendment rules, most particularly the central proscription of content-based regulations of speech, see *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972), the cases outlined above yield a general principle: the State may not suppress exposure to ideas—for the sole *purpose* of suppressing exposure to those ideas—absent sufficiently compelling reasons. Because the school board must perform all its functions "within the limits of the Bill of Rights," *Barnette*, 319 U. S., at 637, this principle necessarily applies in at least a limited way to public education. Surely this is true in an ex-

treme case: as the plurality notes, it is difficult to see how a school board, consistent with the First Amendment, could refuse for political reasons to buy books written by Democrats or by Negroes, or books that are "anti-American" in the broadest sense of that term. Indeed, JUSTICE REHNQUIST appears "cheerfully [to] concede" this point. *Post,* at 907 (dissenting opinion).

In my view, then, the principle involved here is both narrower and more basic than the "right to receive information" identified by the plurality. I do not suggest that the State has any affirmative obligation to provide students with information or ideas, something that may well be associated with a "right to receive." See *post,* at 887 (BURGER, C. J., dissenting); *post,* at 915–918 (REHNQUIST, J., dissenting). And I do not believe, as the plurality suggests, that the right at issue here is somehow associated with the peculiar nature of the school library, see *ante,* at 868–869; if schools may be used to inculcate ideas, surely libraries may play a role in that process.[1] Instead, I suggest that certain forms of state dis-

---

[1] As a practical matter, however, it is difficult to see the First Amendment right that I believe is at work here playing a role in a school's choice of curriculum. The school's finite resources—as well as the limited number of hours in the day—require that education officials make sensitive choices between subjects to be offered and competing areas of academic emphasis; subjects generally are excluded simply because school officials have chosen to devote their resources to one rather than to another subject. As is explained below, a choice of this nature does not run afoul of the First Amendment. In any event, the Court has recognized that students' First Amendment rights in most cases must give way if they interfere "with the schools' work or [with] the rights of other students to be secure and to be let alone," *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 508 (1969), and such interference will rise to intolerable levels if public participation in the management of the curriculum becomes commonplace. In contrast, library books on a shelf intrude not at all on the daily operation of a school.

I also have some doubt that there is a theoretical distinction between removal of a book and failure to acquire a book. But as Judge Newman observed, there is a profound practical and evidentiary distinction between

crimination *between* ideas are improper.   In particular, our precedents command the conclusion that the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons.[2]

Certainly, the unique environment of the school places substantial limits on the extent to which official decisions may be restrained by First Amendment values.   But that environment also makes it particularly important that *some* limits be imposed.   The school is designed to, and inevitably will, inculcate ways of thought and outlooks; if educators intentionally may eliminate all diversity of thought, the school will "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."   *Barnette*, 319 U. S., at 637.   As I see it, then, the question in this case is how to make the delicate accommodation between the limited constitutional restriction that I think is imposed by the First Amendment, and the necessarily broad state authority to regulate education.   In starker terms, we must reconcile the schools' "inculcative" function with the First Amendment's bar on "prescriptions of orthodoxy."

## II

In my view, we strike a proper balance here by holding that school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by

---

the two actions: "removal, more than failure to acquire, is likely to suggest that an impermissible political motivation may be present.   There are many reasons why a book is not acquired, the most obvious being limited resources, but there are few legitimate reasons why a book, once acquired, should be removed from a library not filled to capacity."   638 F. 2d 404, 436 (CA2 1980) (Newman, J., concurring in result).

[2] In effect, my view presents the obverse of the plurality's analysis: while the plurality focuses on the failure to provide information, I find crucial the State's decision to single out an idea for disapproval and then deny access to it.

the officials' disapproval of the ideas involved. It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to the values of the First Amendment. At a minimum, allowing a school board to engage in such conduct hardly teaches children to respect the diversity of ideas that is fundamental to the American system. In this context, then, the school board must "be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," *Tinker* v. *Des Moines School Dist.*, 393 U. S., at 509, and that the board had something in mind in addition to the suppression of partisan or political views it did not share.

As I view it, this is a narrow principle. School officials must be able to choose one book over another, without outside interference, when the first book is deemed more relevant to the curriculum, or better written, or when one of a host of other politically neutral reasons is present. These decisions obviously will not implicate First Amendment values. And even absent space or financial limitations, First Amendment principles would allow a school board to refuse to make a book available to students because it contains offensive language, cf. *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 757 (1978) (POWELL, J., concurring), or because it is psychologically or intellectually inappropriate for the age group, or even, perhaps, because the ideas it advances are "manifestly inimical to the public welfare." *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534 (1925). And, of course, school officials may choose one book over another because they believe that one subject is more important, or is more deserving of emphasis.

As is evident from this discussion, I do not share JUSTICE REHNQUIST's view that the notion of "suppression of ideas" is not a useful analytical concept. See *post*, at 918–920 (dissenting opinion). Indeed, JUSTICE REHNQUIST's discussion it-

self demonstrates that "access to ideas" has been given meaningful application in a variety of contexts. See *post*, at 910–920, 914 ("[e]ducation consists of the selective presentation and explanation of ideas"). And I believe that tying the First Amendment right to the *purposeful* suppression of ideas makes the concept more manageable than JUSTICE REHNQUIST acknowledges. Most people would recognize that refusing to allow discussion of current events in Latin class is a policy designed to "inculcate" Latin, not to suppress ideas. Similarly, removing a learned treatise criticizing American foreign policy from an elementary school library because the students would not understand it is an action unrelated to the *purpose* of suppressing ideas. In my view, however, removing the same treatise because it is "anti-American" raises a far more difficult issue.

It is not a sufficient answer to this problem that a State operates a school in its role as "educator," rather than its role as "sovereign," see *post*, at 908–910 (REHNQUIST, J., dissenting), for the First Amendment has application to all the State's activities. While the State may act as "property owner" when it prevents certain types of expressive activity from taking place on public lands, for example, see *post*, at 908–909, few would suggest that the State may base such restrictions on the content of the speaker's message, or may take its action for the purpose of suppressing access to the ideas involved. See *Police Department of Chicago* v. *Mosley*, 408 U. S., at 96. And while it is not clear to me from JUSTICE REHNQUIST's discussion whether a State operates its public libraries in its "role as sovereign," surely difficult constitutional problems would arise if a State chose to exclude "anti-American" books from its public libraries—even if those books remained available at local bookstores.

Concededly, a tension exists between the properly inculcative purposes of public education and any limitation on the school board's absolute discretion to choose academic materials. But that tension demonstrates only that the problem

here is a difficult one, not that the problem should be resolved by choosing one principle over another. As the Court has recognized, school officials must have the authority to make educationally appropriate choices in designing a curriculum: "the State may 'require teaching by instruction and study of all in our history and in the structure and organization of our government, including the guaranties of civil liberty, which tend to inspire patriotism and love of country.'" *Barnette*, 319 U. S., at 631, quoting *Minersville School District* v. *Gobitis*, 310 U. S. 586, 604 (1940) (Stone, J., dissenting). Thus school officials may seek to instill certain values "by persuasion and example," 319 U. S., at 640, or by choice of emphasis. That sort of positive educational action, however, is the converse of an intentional attempt to shield students from certain ideas that officials find politically distasteful. Arguing that the majority in the community rejects the ideas involved, see *post*, at 889, 891–892 (BURGER, C. J., dissenting), does not refute this principle: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials . . . ." *Barnette*, 319 U. S., at 638.

As THE CHIEF JUSTICE notes, the principle involved here may be difficult to apply in an individual case. See *post*, at 889 (dissenting opinion). But on a record as sparse as the one before us, the plurality can hardly be faulted for failing to explore every possible ramification of its decision. And while the absence of a record "underscore[s] the views of those of us who originally felt that the cas[e] should not be taken," *Ferguson* v. *Moore-McCormack Lines, Inc.*, 352 U. S. 521, 559 (1957) (opinion of Harlan, J.), the case is here, and must be decided.

Because I believe that the plurality has derived a standard similar to the one compelled by my analysis, I join all but Part II–A(1) of the plurality opinion.

JUSTICE WHITE, concurring in the judgment.

The District Court found that the books were removed from the school library because the school board believed them "to be, in essence, vulgar." 474 F. Supp. 387, 397 (EDNY 1979). Both Court of Appeals judges in the majority concluded, however, that there was a material issue of fact that precluded summary judgment sought by petitioners. The unresolved factual issue, as I understand it, is the reason or reasons underlying the school board's removal of the books. I am not inclined to disagree with the Court of Appeals on such a fact-bound issue and hence concur in the judgment of affirmance. Presumably this will result in a trial and the making of a full record and findings on the critical issues.

The plurality seems compelled to go further and issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library. I see no necessity for doing so at this point. When findings of fact and conclusions of law are made by the District Court, that may end the case. If, for example, the District Court concludes after a trial that the books were removed for their vulgarity, there may be no appeal. In any event, if there is an appeal, if there is dissatisfaction with the subsequent Court of Appeals' judgment, and if certiorari is sought and granted, there will be time enough to address the First Amendment issues that may then be presented.

I thus prefer the course taken by the Court in *Kennedy* v. *Silas Mason Co.*, 334 U. S. 249 (1948), a suit involving overtime compensation under the Fair Labor Standards Act. Summary judgment had been granted by the District Court and affirmed by the Court of Appeals. This Court reversed, holding that summary judgment was improvidently granted, and remanded for trial so that a proper record could be made. The Court expressly abjured issuing its advice on the legal

issues involved. Writing for the Court, Justice Jackson stated:

> "We consider it the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts. While we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide.
>
> "Without intimating any conclusion on the merits, we vacate the judgments below and remand the case to the District Court for reconsideration and amplification of the record in the light of this opinion and of present contentions." *Id.*, at 257.

We took a similar course in a unanimous *per curiam* opinion in *Dombrowski* v. *Eastland*, 387 U. S. 82 (1967). There we overturned a summary judgment since it was necessary to resolve a factual dispute about collaboration between one of the respondents and a state legislative committee. We remanded, saying: "In the absence of the factual refinement which can occur only as a result of trial, we need not and, indeed, could not express judgment as to the legal consequences of such collaboration, if it occurred." *Id.*, at 84.

The *Silas Mason* case turned on issues of statutory construction. It is even more important that we take a similar course in cases like *Dombrowski*, which involved Speech or Debate Clause immunity, and in this one, which poses difficult First Amendment issues in a largely uncharted field. We should not decide constitutional questions until it is necessary to do so, or at least until there is better reason to address them than are evident here. I therefore concur in the judgment of affirmance.

CHIEF JUSTICE BURGER, with whom JUSTICE POWELL, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

The First Amendment, as with other parts of the Constitution, must deal with new problems in a changing world. In an attempt to deal with a problem in an area traditionally left to the states, a plurality of the Court, in a lavish expansion going beyond any prior holding under the First Amendment, expresses its view that a school board's decision concerning what books are to be in the school library is subject to federal-court review.[1]  Were this to become the law, this Court would come perilously close to becoming a "super censor" of school board library decisions.  Stripped to its essentials, the issue comes down to two important propositions: *first*, whether local schools are to be administered by elected school boards, or by federal judges and teenage pupils; and *second*, whether the values of morality, good taste, and relevance to education are valid reasons for school board decisions concerning the contents of a school library.  In an attempt to place this case within the protection of the First Amendment, the plurality suggests a new "right" that, when shorn of the plurality's rhetoric, allows this Court to impose

---

[1] At the outset, the plurality notes that certain school board members found the books in question "objectionable" and "improper" for junior and senior high school students.  What the plurality apparently finds objectionable is that the inquiry as to the challenged books was initially stimulated by what is characterized as "a politically conservative organization of parents concerned about education," which had concluded that the books in question were "improper fare for school students."  *Ante*, at 856.  As noted by the District Court, however, and in the plurality opinion, *ante*, at 859, both parties substantially agreed about the motivation of the school board in removing the books:

"[T]he board acted not on religious principles but on its conservative educational philosophy, and on its belief that the nine books removed from the school library and curriculum were irrelevant, vulgar, immoral, and in bad taste, making them educationally unsuitable for the district's junior and senior high school students."  474 F. Supp. 387, 392 (1979).

its own views about what books must be made available to students.[2]

## I

## A

I agree with the fundamental proposition that "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Ante*, at 865. For example, the Court has held that a school board cannot compel a student to participate in a flag salute ceremony, *West Virginia Bd. of Education* v. *Barnette*, 319 U. S. 624 (1943), or *prohibit* a student from expressing certain views, so long as that expression does not disrupt the educational process. *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503 (1969). Here, however, no restraints of any kind are placed on the students. They are free to read the books in question, which are available at public libraries and bookstores; they are free to discuss them in the classroom or elsewhere. Despite this absence of any direct external control on the students' ability to express themselves, the plurality suggests that there is a new First Amendment "entitlement" to have access to particular books in a school library.

The plurality cites *Meyer* v. *Nebraska*, 262 U. S. 390 (1923), which struck down a state law that restricted the

---

[2] In oral argument counsel advised the Court that of the original plaintiffs, only "[o]ne of them is still in school . . . until this June, and will assumedly graduate in June. *There is a potential question of mootness.*" Tr. of Oral Arg. 4–5 (emphasis added). The sole surviving plaintiff has therefore either recently been graduated from high school or is within days or even hours of graduation. Yet the plurality expresses views on a very important constitutional issue. Fortunately, there is no binding holding of the Court on the critical constitutional issue presented.

We do well to remember the admonition of Justice Frankfurter that "the most fundamental principle of constitutional adjudication is not to face constitutional questions but to avoid them, if at all possible." *United States* v. *Lovett*, 328 U. S. 303, 320 (1946) (concurring opinion). In the same vein, Justice Stone warned that "the only check upon our own exercise of power is our own sense of self-restraint." *United States* v. *Butler*, 297 U. S. 1, 79 (1936) (dissenting opinion).

teaching of modern foreign languages in public and private schools, and *Epperson* v. *Arkansas*, 393 U. S. 97 (1968), which declared unconstitutional under the Establishment Clause a law banning the teaching of Darwinian evolution, to establish the validity of federal-court interference with the functioning of schools. The plurality finds it unnecessary "to re-enter this difficult terrain," *ante*, at 861, yet in the next breath relies on these very cases and others to establish the previously unheard of "right" of access to particular books in the public school library.[3] The apparent underlying basis of the plurality's view seems to be that students have an enforceable "right" to receive the information and ideas that are contained in junior and senior high school library books. *Ante*, at 866. This "right" purportedly follows "ineluctably" from the sender's First Amendment right to freedom of speech and as a "necessary predicate" to the recipient's meaningful exercise of his own rights of speech, press, and political freedom. *Ante*, at 866–867. No such right, however, has previously been recognized.

It is true that where there is a willing distributor of materials, the government may not impose unreasonable obstacles to dissemination by the third party. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976). And where the speaker desires to express certain ideas, the government may not impose unreasonable restraints. *Tinker* v. *Des Moines School Dist.*, *supra*. It does not follow, however, that a school board must affirmatively aid the speaker in his communication with the recipient. In short the plurality suggests today that if a writer has something to say, the government through its schools must be the courier. None of the cases cited by the plurality establish this broad-based proposition.

First, the plurality argues that the right to receive ideas is derived in part from the sender's First Amendment rights to

---

[3] Of course, it is perfectly clear that, unwise as it would be, the board could wholly dispense with the school library, so far as the First Amendment is concerned.

send them. Yet we have previously held that a sender's rights are not absolute. *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970).[4] Never before today has the Court indicated that the government has an *obligation* to aid a speaker or author in reaching an audience.

Second, the plurality concludes that "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Ante*, at 867 (emphasis in original). However, the "right to receive information and ideas," *Stanley* v. *Georgia*, 394 U. S. 557, 564 (1969), cited *ante*, at 867, does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government. The plurality cites James Madison to emphasize the importance of having an informed citizenry. *Ibid.* We all agree with Madison, of course, that knowledge is necessary for effective government. Madison's view, however, does not establish a *right* to have particular books retained on the school library shelves if the school board decides that they are inappropriate or irrelevant to the school's mission. Indeed, if the need to have an informed citizenry creates a "right," why is the government not also required to provide ready access to a variety of information? This same need would support a constitutional "right" of the people to have public libraries as part of a new constitutional "right" to continuing adult education.

The plurality also cites *Tinker*, *supra*, to establish that the recipient's right to free speech encompasses a right to have particular books retained on the school library shelf. *Ante*, at 868. But the cited passage of *Tinker* notes only that school officials may not *prohibit* a student from expressing his or her view on a subject unless that expression interferes with

---

[4] In *Rowan* a unanimous Court upheld the right of a homeowner to direct the local post office to stop delivery of unwanted materials that the householder viewed as "erotically arousing or sexually provocative."

the legitimate operations of the school. The government does not "contract the spectrum of available knowledge." *Griswold* v. *Connecticut*, 381 U. S. 479, 482 (1965), cited *ante*, at 866, by choosing not to retain certain books on the school library shelf; it simply chooses not to be the conduit for that particular information. In short, even assuming the desirability of the policy expressed by the plurality, there is not a hint in the First Amendment, or in any holding of this Court, of a "right" to have the government provide continuing access to certain books.

B

Whatever role the government might play as a conduit of information, schools in particular ought not be made a slavish courier of the material of third parties. The plurality pays homage to the ancient verity that in the administration of the public schools "'there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political.'" *Ante*, at 864. If, as we have held, schools may legitimately be used as vehicles for "inculcating fundamental values necessary to the maintenance of a democratic political system," *Ambach* v. *Norwick*, 441 U. S. 68, 77 (1979), school authorities must have broad discretion to fulfill that obligation. Presumably all activity within a primary or secondary school involves the conveyance of information and at least an implied approval of the worth of that information. How are "fundamental values" to be inculcated except by having school boards make content-based decisions about the appropriateness of retaining materials in the school library and curriculum. In order to fulfill its function, an elected school board *must* express its views on the subjects which are taught to its students. In doing so those elected officials express the views of their community; they may err, of course, and the voters may remove them. It is a startling erosion of the very idea of democratic government to have this Court arrogate to itself the power the plurality asserts today.

The plurality concludes that under the Constitution school boards cannot choose to retain or dispense with books if their discretion is exercised in a "narrowly partisan or political manner." *Ante,* at 870. The plurality concedes that permissible factors are whether the books are "pervasively vulgar," *ante,* at 871, or educationally unsuitable. *Ibid.* "Educational suitability," however, is a standardless phrase. This conclusion will undoubtedly be drawn in many—if not most—instances because of the decisionmaker's content-based judgment that the ideas contained in the book or the idea expressed from the author's method of communication are inappropriate for teenage pupils.

The plurality also tells us that a book may be removed from a school library if it is "pervasively vulgar." But why must the vulgarity be "pervasive" to be offensive? Vulgarity might be concentrated in a single poem or a single chapter or a single page, yet still be inappropriate. Or a school board might reasonably conclude that even "random" vulgarity is inappropriate for teenage school students. A school board might also reasonably conclude that the school board's retention of such books gives those volumes an implicit endorsement. Cf. *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978).

Further, there is no guidance whatsoever as to what constitutes "political" factors. This Court has previously recognized that public education involves an area of broad public policy and "'go[es] to the heart of representative government.'" *Ambach* v. *Norwick, supra,* at 74. As such, virtually all educational decisions necessarily involve "political" determinations.

What the plurality views as valid reasons for removing a book at their core involve partisan judgments. Ultimately the federal courts will be the judge of whether the motivation for book removal was "valid" or "reasonable." Undoubtedly the validity of many book removals will ultimately turn on a judge's evaluation of the books. Discretion must be used,

and the appropriate body to exercise that discretion is the local elected school board, not judges.[5]

We can all agree that as a matter of *educational policy* students should have wide access to information and ideas. But the people elect school boards, who in turn select administrators, who select the teachers, and these are the individuals best able to determine the substance of that policy. The plurality fails to recognize the fact that local control of education involves democracy in a microcosm. In most public schools in the United States the *parents* have a large voice in running the school.[6] Through participation in the election of school board members, the parents influence, if not control, the direction of their children's education. A school board is not a giant bureaucracy far removed from accountability for its actions; it is truly "of the people and by the people." A school board reflects its constituency in a very real sense and thus could not long exercise unchecked discretion in its choice to acquire or remove books. If the parents disagree with the educational decisions of the school board, they can take steps to remove the board members from office. Finally, even if

---

[5] Indeed, this case is illustrative of how essentially all decisions concerning the retention of school library books will become the responsibility of federal courts. As noted in n. 1, *supra*, the parties agreed that the school board in this case acted not on religious principles but "on its belief that the nine books removed from the school library and curriculum were irrelevant, vulgar, immoral, and in bad taste, making them educationally unsuitable for the district's junior and senior high school students." Despite this agreement as to motivation, the case is to be remanded for a determination of whether removal was in violation of the standard adopted by the plurality. The school board's error appears to be that it made its own determination rather than relying on experts. *Ante*, at 874–875.

[6] *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). There are approximately 15,000 school districts in the country. U. S. Bureau of Census, Statistical Abstract of the United States 297 (102d ed. 1981) (Table 495: Number of Local Governments, by Taxing Power and Type, and Public School Systems—States: 1972 and 1977). See also Diamond, The First Amendment and Public Schools: The Case Against Judicial Intervention, 59 Texas L. Rev. 477, 506–507, n. 130 (1981).

parents and students cannot convince the school board that book removal is inappropriate, they have alternative sources to the same end. Books may be acquired from bookstores, public libraries, or other alternative sources unconnected with the unique environment of the local public schools.[7]

## II

No amount of "limiting" language could rein in the sweeping "right" the plurality would create. The plurality distinguishes library books from textbooks because library books "by their nature are optional rather than required reading." *Ante*, at 862. It is not clear, however, why this distinction requires *greater* scrutiny before "optional" reading materials may be removed. It would appear that required reading and textbooks have a greater likelihood of imposing a " 'pall of orthodoxy' " over the educational process than do optional reading. *Ante*, at 870. In essence, the plurality's view transforms the availability of this "optional" reading into a "right" to have this "optional" reading maintained at the demand of teenagers.

The plurality also limits the new right by finding it applicable only to the *removal* of books once acquired. Yet if the First Amendment commands that certain books cannot be *removed*, does it not equally require that the same books be *acquired*? Why does the coincidence of timing become the basis of a constitutional holding? According to the plurality, the evil to be avoided is the "official suppression of ideas." *Ante*, at 871. It does not follow that the decision to *remove* a book is less "official suppression" than the decision not to acquire a book desired by someone.[8] Similarly, a decision to

---

[7] Other provisions of the Constitution, such as the Establishment Clause, *Epperson* v. *Arkansas, supra,* and the Equal Protection Clause, also limit the discretion of the school board.

[8] The formless nature of the "right" found by the plurality in this case is exemplified by this purported distinction. Presumably a school board could, for any reason, choose not to purchase a book for its library. Once

eliminate certain material from the curriculum, history for example, would carry an equal—probably greater—prospect of "official suppression." Would the decision be subject to our review?

## III

Through use of bits and pieces of prior opinions unrelated to the issue of this case, the plurality demeans our function of constitutional adjudication. Today the plurality suggests that the *Constitution* distinguishes between school libraries and school classrooms, between *removing* unwanted books and *acquiring* books. Even more extreme, the plurality concludes that the Constitution *requires* school boards to justify to its teenage pupils the decision to remove a particular book from a school library. I categorically reject this notion that the Constitution dictates that judges, rather than parents, teachers, and local school boards, must determine how the standards of morality and vulgarity are to be treated in the classroom.

JUSTICE POWELL, dissenting.

The plurality opinion today rejects a basic concept of public school education in our country: that the States and locally elected school boards should have the responsibility for determining the educational policy of the public schools. After today's decision any junior high school student, by instituting a suit against a school board or teacher, may invite a judge to overrule an educational decision by the official body designated by the people to operate the schools.

---

it purchases that book, however, it is "locked in" to retaining it on the school shelf until it can justify a reason for its removal. This anomalous result of "book tenure" was pointed out by the District Court in this case. 474 F. Supp., at 395–396. See also *Presidents Council, District 25* v. *Community School Board No. 25*, 457 F. 2d 289, 293 (CA2 1972). Under the plurality view, if a school board wants to be assured that it maintains control over the education of its students, every page of every book sought to be acquired must be read before a purchase decision is made.

I

School boards are uniquely local and democratic institutions. Unlike the governing bodies of cities and counties, school boards have only one responsibility: the education of the youth of our country during their most formative and impressionable years. Apart from health, no subject is closer to the hearts of parents than their children's education during those years. For these reasons, the governance of elementary and secondary education traditionally has been placed in the hands of a local board, responsible locally to the parents and citizens of school districts. Through parent-teacher associations (PTA's), and even less formal arrangements that vary with schools, parents are informed and often may influence decisions of the board. Frequently, parents know the teachers and visit classes. It is fair to say that no single agency of government at any level is closer to the people whom it serves than the typical school board.

I therefore view today's decision with genuine dismay. Whatever the final outcome of this suit and suits like it, the resolution of educational policy decisions through litigation, and the exposure of school board members to liability for such decisions, can be expected to corrode the school board's authority and effectiveness. As is evident from the generality of the plurality's "standard" for judicial review, the decision as to the educational worth of a book is a highly subjective one. Judges rarely are as competent as school authorities to make this decision; nor are judges responsive to the parents and people of the school district.[1]

---

[1] The plurality speaks of the need for "sensitive" decisionmaking, pursuant to "regular" procedures. See *ante*, at 874, n. 26, and 875. One wonders what indeed does this mean. In this case, for example, the board did not act precipitously. It simply did not agree with the recommendations of a committee it had appointed. Would the plurality require—as a constitutional matter—that the board delegate unreviewable authority to such a committee?

The new constitutional right, announced by the plurality, is described as a "right to receive ideas" in a school. *Ante*, at 867. As the dissenting opinions of THE CHIEF JUSTICE and JUSTICE REHNQUIST so powerfully demonstrate, however, this newfound right finds no support in the First Amendment precedents of this Court. And even apart from the inappropriateness of judicial oversight of educational policy, the new constitutional right is framed in terms that approach a meaningless generalization. It affords little guidance to courts, if they—as the plurality now authorizes them—are to oversee the inculcation of ideas. The plurality does announce the following standard: A school board's "discretion may not be exercised in a narrowly partisan or political manner." *Ante*, at 870. But this is a standardless standard that affords no more than subjective guidance to school boards, their counsel, and to courts that now will be required to decide whether a particular decision was made in a "narrowly partisan or political manner." Even the "chancellor's foot" standard in ancient equity jurisdiction was never this fuzzy.

As JUSTICE REHNQUIST tellingly observes, how does one limit—on a principled basis—today's new constitutional right? If a 14-year-old child may challenge a school board's decision to remove a book from the library, upon what theory is a court to prevent a like challenge to a school board's decision not to purchase that identical book? And at the even more "sensitive" level of "receiving ideas," does today's decision entitle student oversight of which courses may be added or removed from the curriculum, or even of what a particular teacher elects to teach or not teach in the classroom? Is not the "right to receive ideas" as much—or indeed even more—implicated in these educational questions?[2]

---

[2] The plurality suggests that the books in a school library derive special protection under the Constitution because the school library is a place in which students exercise unlimited choice. See *ante*, at 868–869. This sug-

## II

The plurality's reasoning is marked by contradiction. It purports to acknowledge the traditional role of school boards and parents in deciding what should be taught in the schools. It states the truism that the schools are "vitally important 'in the preparation of individuals for participation as citizens,' and as vehicles for 'inculcating fundamental values necessary to the maintenance of a democratic political system.'" *Ante,* at 864. Yet when a school board, as in this case, takes its responsibilities seriously and seeks to decide what the fundamental values are that should be imparted, the plurality finds a constitutional violation.

Just this Term the Court held, in an opinion I joined, that the children of illegal aliens must be permitted to attend the public schools. See *Plyler* v. *Doe, ante,* p. 202. Quoting from earlier opinions, the Court noted that the "'public schoo[l is] a most vital civic institution for the preservation of democratic system of government'" and that the public schools are "the primary vehicle for transmitting 'the values on which our society rests.'" *Ante,* at 221. By denying to illegal aliens the opportunity "to absorb the values and skills upon which our social order rests" the law under review placed a lifelong disability upon these illegal alien children. *Ibid.*

Today the plurality drains much of the content from these apt phrases. A school board's attempt to instill in its students the ideas and values on which a democratic system depends is viewed as an impermissible suppression of other ideas and values on which other systems of government and other societies thrive. Books may not be removed because

---

gestion is without support ·in law or fact. It is contradicted by this very case. The school board in this case does not view the school library as a place in which students pick from an unlimited range of books—some of which may be inappropriate for young people. Rather, the school library is analogous to an assigned reading list within which students may exercise a degree of choice.

they are indecent; extol violence, intolerance, and racism; or degrade the dignity of the individual. Human history, not the least that of the 20th century, records the power and political life of these very ideas. But they are not our ideas or values. Although I would leave this educational decision to the duly constituted board, I certainly would not *require* a school board to promote ideas and values repugnant to a democratic society or to teach such values to *children*.

In different contexts and in different times, the destruction of written materials has been the symbol of despotism and intolerance. But the removal of nine vulgar or racist books from a high school library by a concerned local school board does not raise this specter. For me, today's decision symbolizes a debilitating encroachment upon the institutions of a free people.

Attached as an Appendix hereto is Judge Mansfield's summary of excerpts from the books at issue in this case.

## APPENDIX TO OPINION OF POWELL, J., DISSENTING

"The excerpts which led the Board to look into the educational suitability of the books in question are set out (with minor corrections after comparison with the text of the books themselves) below. The pagination and the underlinings are retained from the original report used by the board. In newer editions of some of the books, the quotes appear at different pages.

"1) *SOUL ON ICE* by Eldridge Cleaver
*PAGE QUOTE*

157–158 ' . . . There are white men who will pay you to fuck their wives. They approach you and say, "How would you like to fuck a white woman?" "What is this?" you ask. "On the up-and-up," he assures you. "It's all right. She's my wife. She needs black rod, is all. She has to have it. It's like a medicine or drug to her. She has to have it. I'll pay you. It's all on the level, no trick involved. Interested?"

You go with him and he drives you to their home. The three of you go into the bedroom. There is a certain type who will leave you and his wife alone and tell you to pile her real good. After it is all over, he will pay you and drive you to wherever you want to go. Then there are some who like to peep at you through a keyhole and watch you have his woman, or peep at you through a window, or lie under the bed and listen to the creaking of the bed as you work out. There is another type who likes to masturbate while he stands beside the bed and watches you pile her. There is the type who likes to eat his woman up after you get through piling her. And there is the type who only wants you to pile her for a little while, just long enough to thaw her out and kick her motor over and arouse her to heat, then he wants you to jump off real quick and he will jump onto her and together they can make it from there by themselves.'

"2) *A HERO AIN'T NOTHING BUT A SANDWICH*
  by Alice Childress
*PAGE QUOTE*

10 'Hell, no! *Fuck the society.*'
64–65 'The hell with the junkie, the wino, the capitalist, the welfare checks, the world . . . yeah, and *fuck* you too!'
75–76 'They can have back the spread and curtains, I'm too old for them *fuckin* bunnies anyway.'

"3) *THE FIXER* by Bernard Malamud
*PAGE QUOTE*

52 'What do you think goes on in the wagon at night: Are the drivers on their knees *fucking their mothers?*'
90 '*Fuck yourself*, said the blinker, etc.'
92 'Who else would do anything like that but a *mother-fucking* Zhid?'
146 'No more noise out of you or I'll shoot your *Jew cock off.*'
189 'Also there's a lot of *fucking in the Old Testament*, so how is that religious?'
192 'You better go *fuck yourself*, Bok, said Kogin, I'm onto your Jew tricks.'

215 'Ding-dong giddyap.   A *Jew's cock's* in the devil's hock.'
216 'You *cocksucker* Zhid, I ought make you lick it up off the floor.'

"4) *GO ASK ALICE* by Anonymous
*PAGE QUOTE*

31 'I wonder if sex without acid could be so exciting, so wonderful, so indescribable.   I always thought it just took a minute, or that it would be like dogs mating.'
47 'Chris and I walked into Richie and Ted's apartment to find the bastards stoned and making love to each other . . . low class queer.'
81 'shitty, goddamned, pissing, ass, goddamned beJesus, screwing life's, ass, shit.   Doris was ten and had *humped* with who knows how many men in between . . . her current stepfather started having sex with her but good . . . *sonofabitch balling her*'
83 'but now when I face a girl its like facing a boy.   I get all excited and turned on.   *I want to screw with the girl. . . .*'
84 'I'd rather screw with a guy . . . sometimes I want one of the girls to kiss me.   I want her to touch me, to have her sleep under me.'
84 'Another day, another *blow job* . . . If I don't give *Big Ass a blow* he'll cut off my supply . . . and LittleJacon is yelling, "Mama, *Daddy can't come now.   He's humping Carla.*"
85 'Shit, goddamn, goddamn prick, son-of-a-bitch, ass, pissed, bastard, goddamn, bullshit
94 'I hope you have a *nice orgasm with your dog tonight.*'
110 'You *fucking* Miss Polly pure
117 'Then he said that all I needed was a good *fuck.*'
146 'It might be great because I'm practically a virgin in the sense that I've never had sex except when I've been stoned. . . .'

"5) *SLAUGHTERHOUSE FIVE* by Kurt Vonnegut, Jr.
*PAGE QUOTE*

29 'Get out of the road, you dumb *motherfucker.*'   The last word was still a novelty in the speech of white people in 1944.

It was fresh and astonishing to Billy, who had never *fucked* anybody . . .'

32 'You stake a guy out on an anthill in the desert-see?  He's facing upward, and you put *honey* all over his *balls and pecker*, and you cut off his eyelids so he has to stare at the sun till he dies.'

34 'He had a prophylactic kit containing two tough condoms 'For the prevention of disease only!' . . . He had a dirty picture of a *woman* attempting *sexual intercourse with a shetland pony*.'

94 & 95 'But the Gospels actually taught this: Before you kill somebody, make absolutely sure he isn't well connected . . . The flaw in the Christ stories, said the visitor from outer space, was that Christ who didn't look like much, was actually the son of the Most Powerful Being in the Universe. Readers understood that, so, when they came to the crucifixion, they naturally thought . . . Oh boy-they sure picked the wrong guy to lynch this time!  And that thought had a brother: There are right people to lynch.  People not well connected . . . .  The visitor from outer space made a gift to Earth of a new Gospel.  In it, Jesus really WAS a nobody, and a pain in the neck to a lot of people with better connections then he had . . . .  So the people amused themselves one day by nailing him to a cross and planting the cross in the ground.  There couldn't possibly be any repercussions, the lynchers thought . . . since the new Gospel hammered home again and again what a nobody Jesus was.  And then just before the nobody died . . . .  The voice of God came crashing down.  He told the people that he was adopting the bum as his son . . . God said this: *From this moment on, He will punish horribly anybody who torments a bum who has no connections.*'

99 'They told him that there could be no Earthling babies without male homosexuals.  There could be babies without female homosexuals.'

120 'Why don't you go *fuck* yourself?  Don't think I haven't

tried . . . he was going to have revenge, and that revenge was sweet . . . It's the sweetest thing there is, said Lazzaro. People *fuck* with me, he said, and *Jesus Christ* are they ever fucking sorry.'

122 'And he'll pull out a gun and *shoot his pecker off.* The stranger'll let him think a couple of seconds about who Paul Lazzaro is and what life's gonna be like without a *pecker.* Then he'll shoot him once in the guts and walk away. . . . He died on account of this silly *cocksucker* here. So I promised him I'd have this silly *cocksucker* shot after the war.'

134 'In my prison cell I sit . . . With my *britches full of shit,* And my *balls are bouncing* gently on the floor. And I see the bloody snag when she bit me in the bag . . . Oh, I'll never fuck *a Polack* any more.'

173 'And the peckers of the young men would still be *semi-erect,* and their *muscles* would be *bulging like cannonballs.'*

175 'They didn't have *hard-ons* . . . Everybody else did.'

177 'The magazine, which was published for *lonesome men to jerk off to.'*

178 'and one critic said. . . . 'To describe *blow-jobs* artistically."

"6) *THE BEST SHORT STORIES BY NEGRO WRITERS*
 Ed. *by Langston Hughes*
*PAGE QUOTE*

176 'like bat's shit and camel piss,'

228 'that no-count bitch of a daughter of yours is up there up North making a whore of herself.'

237 'they made her get out and stand in front of the headlights of the car and pull down her pants and raise her dress—they said that was the only way they could be sure. And you can imagine what they said and what they did—.'

303 'You need some pussy. Come on, let's go up to the whore house on the hill.'

'Oh, these bastards, these bastards, this God damned Army and the bastards in it. The sons of bitches!'

436 'he produced a brown rag doll, looked at her again, then

grabbed the doll by its legs and tore it part way up the middle. Then he jammed his finger into the rip between the doll's legs. The other men laughed. . . .'

444 'The pimps, hustlers, lesbians, and others trying to misuse me.'

462 'But she had straight firm legs and her breasts were small and upright. No doubt if she'd had children her breasts would be hanging like little empty purses.'

464 'She first became aware of the warm tense nipples on her breasts. Her hands went up gently to clam them.' 'In profile, his penis hung like a stout tassle. She could even tell that he was circumcised.'

406 'Cadillac Bill was busy following Luheaster around, rubbing her stomach and saying, "Magic Stomach, Magic Stomach, bring me a little baby cadillac."' 'One of the girls went upstairs with Red Top and stayed for about forty five minutes.'

"7) *BLACK BOY* by Richard Wright
*PAGE QUOTE*

70–71 'We black children—seven or eight or nine years of age—used to run to the Jew's store and shout:

 . . . Bloody Christ Killers
Never trust a Jew
Bloody Christ Killers
What won't a Jew do . . .
Red, white and blue
Your pa was a Jew
Your ma a dirty dago
What the hell is you?'

265 'Crush that nigger's nuts, nigger!' 'Hit that nigger!' 'Aw, fight, you goddam niggers!' 'Sock 'im, in his f-k-g-piece!' 'Make 'im bleed!'

"8) *LAUGHING BOY* by Oliver LaFarge
*PAGE QUOTE*

38 'I'll tell you, she is all bad; for two bits she will do the worst thing.'

258–9 'I was frightened when he wanted me to lie with him, but he made me feel all right. He knew all about how to make women forget themselves, that man.'

"9) *THE NAKED APE* by Desmond Morris
*PAGE QUOTE*

73–74 'Also, the frontal approach provides the maximum possibility for stimulation of the female's clitoris during the pelvic thrusting of the male. It is true that it will be passively, stimulated by the pulling effect of the male's thrusts, regardless of his body position in relation to the female, but in a face-to-face mating there will in addition be the direct rhythmic pressure of the male's pubic region on to the clitoral area, and this will considerably heighten the stimulation . . .' 'So it seems plausible to consider that face-to-face copulation is basic to our species. There are, of course, a number of variations that do not eliminate the frontal element: male above, female above, side by side, squatting, standing, and so on, but the most efficient and commonly used one is with both partners horizontal, the male above the female. . . .'

80 ' . . . This broadening of the penis results in the female's external genitals being subjected to much more pulling and pushing during the performance of pelvic thrusts. With each inward thrust of the penis, the clitoral region is pulled downwards and then with each withdrawal, it moves up again. Add to this the rhythmic pressure being exerted on the clitoris region by the pubic region of the frontally copulating male, and you have a repeated massaging of the clitoris that—were she a male—would virtually be masturbatory.'

94–99 ' . . . If either males or females cannot for some reason obtain sexual access to their opposite numbers, they will find sexual outlets in other ways. They may use other members of their own sex, or they may even use members of other species, or they may masturbate. . . .'

"10) *READER FOR WRITERS . . .*"

638 F. 2d 404, 419–422, n. 1 (CA2 1980) (Mansfield, J., dissenting).

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE POWELL join, dissenting.

Addressing only those aspects of the constitutional question which must be decided to determine whether or not the District Court was correct in granting summary judgment, I conclude that it was. I agree fully with the views expressed by THE CHIEF JUSTICE, and concur in his opinion. I disagree with JUSTICE BRENNAN's opinion because it is largely hypothetical in character, failing to take account of the facts as admitted by the parties pursuant to local rules of the District Court for the Eastern District of New York, and because it is analytically unsound and internally inconsistent.[1]

---

[1] I also disagree with JUSTICE WHITE's conclusion that he need not decide the constitutional issue presented by this case. That view seems to me inconsistent with the "rule of four"—"that any case warranting consideration in the opinion of [four Justices] of the Court will be taken and disposed of" on the merits, *Ferguson* v. *Moore-McCormack Lines, Inc.*, 352 U. S. 521, 560 (1957) (opinion of Harlan, J.)—which we customarily follow in exercising our certiorari jurisdiction. His concurrence, although not couched in such language, is in effect a single vote to dismiss the writ of certiorari as improvidently granted. Justice Harlan debated this issue with Justice Frankfurter in *Ferguson* v. *Moore-McCormack Lines, supra*, and his view ultimately attracted the support of six out of the seven remaining Members of the Court. He stated:

"In my opinion due adherence to [the 'rule of four'] requires that once certiorari has been granted a case should be disposed of on the premise that it is properly here, in the absence of considerations appearing which were not manifest or fully apprehended at the time certiorari was granted. In [this case] I am unable to say that such considerations exist, even though I do think that the arguments on the merits underscored the views of those of us who originally felt that the cas[e] should not be taken because [it] involved only issues of fact, and presented nothing of sufficient general importance to warrant this substantial expenditure of the Court's time." *Id.*, at 559.

The case upon which JUSTICE WHITE relies, *Kennedy* v. *Silas Mason Co.*, 334 U. S. 249 (1948), was disposed of in an opinion which commanded the votes of seven of the nine Members of the Court. There could therefore be no question of an infringement of the "rule of four." Certainly any intimation from that case that this Court should not review questions of law in cases where the District Court has granted summary judgment is

## I

## A

JUSTICE BRENNAN's opinion deals far more sparsely with the procedural posture of this case than it does with the constitutional issues which it conceives to arise under the First Amendment. It first launches into a confusing, discursive exegesis on these constitutional issues as applied to junior high school and high school libraries, *ante*, at 863–872, and only thereafter does it discuss the state of the record before the Court. *Ante*, at 872–875. Because the record facts should always establish the limits of the Court's constitutional analysis, and are particularly relevant in cases where the trial court has granted summary judgment, I think that JUSTICE BRENNAN's approach violates our "long . . . considered practice not to decide abstract, hypothetical or contingent questions, or to decide any constitutional question in advance of the necessity for its decision." *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, 461 (1945) (citations omitted).

When JUSTICE BRENNAN finally does address the state of the record, he refers to snippets and excerpts of the relevant facts to explain why a grant of summary judgment was improper. But he totally ignores the effect of Rule 9(g) of the local rules of the District Court, under which the parties set forth their version of the disputed facts in this case.[2] Since

---

belied by subsequent decisions too numerous to catalogue. See, *e. g., Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185 (1976); *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975); *Mills* v. *Alabama*, 384 U. S. 214 (1966).

[2] Rule 9(g) of the local rules of the United States District Court for the Eastern District of New York provides:

"Upon any motion for summary judgment pursuant to Rule 56 of the Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.

"The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

summary judgment was entered against respondents, they are entitled to have their version of the facts, as embodied in their Rule 9(g) statement, accepted for purposes of our review. Since the parties themselves are presumably the best judges of the extent of the factual dispute between them, however, respondents certainly are not entitled to any more favorable version of the facts than that contained in their own Rule 9(g) statement. JUSTICE BRENNAN's combing through the record of affidavits, school bulletins, and the like for bits and snatches of dispute is therefore entirely beside the point at this stage of the case.

Considering only the respondents' description of the factual aspects of petitioners' motivation, JUSTICE BRENNAN's apparent concern that the Board's action may have been a sinister political plot "to suppress ideas" may be laid to rest. The members of the Board, in deciding to remove these books, were undoubtedly influenced by their own "personal values, morals, and tastes,"[3] just as any member of a school board is apt to be so influenced in making decisions as to whether a book is educationally suitable. Respondents essentially conceded that some excerpts of the removed books "contained profanities, some were sexually explicit, some were ungrammatical, some were anti-American, and some were offensive to racial, religious or ethnic groups."[4]

Respondents also agreed that, "[a]lthough the books them-

---

"All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

[3] Paragraph 4 of respondents' Rule 9(g) statement asserts that petitioners' "evaluation of the suitability of the books was based on [their] personal values, morals, and tastes." App. 139.

[4] Paragraph 8 of respondents' Rule 9(g) statement reads:

"Defendants Ahrens and Martin objected to those excerpts because some contained profanities, some were sexually explicit, some were ungrammatical, some were anti-American, and some were offensive to racial, religious or ethnic groups." App. 140.

selves were excluded from use in the schools in any way, [petitioners] have not precluded discussion about the themes of the books or the books themselves." App. 140. JUSTICE BRENNAN's concern with the "suppression of ideas" thus seems entirely unwarranted on this state of the record, and his creation of constitutional rules to cover such eventualities is entirely gratuitous. Though for reasons stated in Part II of this opinion I entirely disagree with JUSTICE BRENNAN's treatment of the constitutional issue, I also disagree with his opinion for the entirely separate reason that it is not remotely tailored to the facts presented by this case.

In the course of his discussion, JUSTICE BRENNAN states:

> "Petitioners rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner. If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students . . . . The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our Constitution does not permit the official suppression of *ideas*." *Ante,* at 870–871 (emphasis in original).

I can cheerfully concede all of this, but as in so many other cases the extreme examples are seldom the ones that arise in the real world of constitutional litigation. In *this case* the facts taken most favorably to respondents suggest that nothing of this sort happened. The nine books removed undoubtedly did contain "ideas," but in the light of the excerpts from them found in the dissenting opinion of Judge Mansfield in the Court of Appeals, it is apparent that eight of them contained demonstrable amounts of vulgarity and profanity, see 638 F. 2d 404, 419–422, n. 1 (CA2 1980), and the ninth con-

tained nothing that could be considered partisan or political, see *id.*, at 428, n. 6. As already demonstrated, respondents admitted as much. Petitioners did not, for the reasons stated hereafter, run afoul of the First and Fourteenth Amendments by removing these particular books from the library in the manner in which they did. I would save for another day—feeling quite confident that that day will not arrive—the extreme examples posed in JUSTICE BRENNAN's opinion.

### B

Considerable light is shed on the correct resolution of the constitutional question in this case by examining the role played by petitioners. Had petitioners been the members of a town council, I suppose all would agree that, absent a good deal more than is present in this record, they could not have prohibited the sale of these books by private booksellers within the municipality. But we have also recognized that the government may act in other capacities than as sovereign, and when it does the First Amendment may speak with a different voice:

> "[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering* v. *Board of Education*, 391 U. S. 563, 568 (1968).

By the same token, expressive conduct which may not be prohibited by the State as sovereign may be proscribed by the State as property owner: "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedi-

cated." *Adderley* v. *Florida*, 385 U. S. 39, 47 (1966) (upholding state prohibition of expressive conduct on certain state property).

With these differentiated roles of government in mind, it is helpful to assess the role of government as educator, as compared with the role of government as sovereign. When it acts as an educator, at least at the elementary and secondary school level, the government is engaged in inculcating social values and knowledge in relatively impressionable young people. Obviously there are innumerable decisions to be made as to what courses should be taught, what books should be purchased, or what teachers should be employed. In every one of these areas the members of a school board will act on the basis of their own personal or moral values, will attempt to mirror those of the community, or will abdicate the making of such decisions to so-called "experts."[5] In this connection I find myself entirely in agreement with the observation of the Court of Appeals for the Seventh Circuit in *Zykan* v. *Warsaw Community School Corp.*, 631 F. 2d 1300, 1305 (1980), that it is "permissible and appropriate for local boards to make educational decisions based upon their personal social, political and moral views." In the very course of administering the many-faceted operations of a school district, the mere decision to purchase some books will necessarily preclude the possibility of purchasing others. The decision to teach a particular subject may preclude the possibility of teaching another subject. A decision to replace a teacher because of ineffectiveness may by implication be seen as a disparagement of the subject matter taught. In each of these instances, however, the book or the exposure to the

---

[5] There are intimations in JUSTICE BRENNAN's opinion that if petitioners had only consulted literary experts, librarians, and teachers their decision might better withstand First Amendment attack. *Ante,* at 874, and n. 26. These observations seem to me wholly fatuous; surely ideas are no more accessible or no less suppressed if the school board merely ratifies the opinion of some other group rather than following its own opinion.

subject matter may be acquired elsewhere. The managers of the school district are not proscribing it as to the citizenry in general, but are simply determining that it will not be included in the curriculum or school library. In short, actions by the government as educator do not raise the same First Amendment concerns as actions by the government as sovereign.

## II

JUSTICE BRENNAN would hold that the First Amendment gives high school and junior high school students a "right to receive ideas" in the school. *Ante,* at 867. This right is a curious entitlement. It exists only in the library of the school, and only if the idea previously has been acquired by the school in book form. It provides no protection against a school board's decision not to acquire a particular book, even though that decision denies access to ideas as fully as removal of the book from the library, and it prohibits removal of previously acquired books only if the remover "dislike[s] the ideas contained in those books," even though removal for any other reason also denies the students access to the books. *Ante,* at 871–872.

But it is not the limitations which JUSTICE BRENNAN places on the right with which I disagree; they simply demonstrate his discomfort with the new doctrine which he fashions out of whole cloth. It is the very existence of a right to receive information, in the junior high school and high school setting, which I find wholly unsupported by our past decisions and inconsistent with the necessarily selective process of elementary and secondary education.

## A

The right described by JUSTICE BRENNAN has never been recognized in the decisions of this Court and is not supported by their rationale. JUSTICE BRENNAN correctly observes that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

*Tinker* v. *Des Moines School District*, 393 U. S. 503, 506 (1969). But, as this language from *Tinker* suggests, our past decisions in this area have concerned freedom of speech and expression, not the right of access to particular ideas. We have held that students may not be prevented from symbolically expressing their political views by the wearing of black arm bands, *Tinker* v. *Des Moines School District, supra,* and that they may not be forced to participate in the symbolic expression of saluting the flag, *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624 (1943). But these decisions scarcely control the case before us. Neither the District Court nor the Court of Appeals found that petitioners' removal of books from the school libraries infringed respondents' right to speak or otherwise express themselves.

Despite JUSTICE BRENNAN's suggestion to the contrary, this Court has never held that the First Amendment grants junior high school and high school students a right of access to certain information in school. It is true that the Court has recognized a limited version of that right in other settings, and JUSTICE BRENNAN quotes language from five such decisions and one of his own concurring opinions in order to demonstrate the viability of the right-to-receive doctrine. *Ante,* at 866–867. But not one of these cases concerned or even purported to discuss elementary or secondary educational institutions.[6] JUSTICE BRENNAN brushes over this significant

---

[6] The right of corporations to make expenditures or contributions in order to influence ballot issues was the question presented in *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 783 (1978), and the language which JUSTICE BRENNAN quotes from that decision, *ante,* at 866, was explicitly limited to "the Court's decisions involving corporations in the business of communications or entertainment." 435 U. S., at 783. In *Kleindienst* v. *Mandel,* 408 U. S. 753 (1972), the Court upheld the power of Congress and the Executive Branch to prevent the entry into this country of a Marxist theoretician who had been invited to lecture at an American university, despite the First Amendment rights of citizens who wished to hear him. *Stanley* v. *Georgia,* 394 U. S. 557 (1969), held that the First Amendment prohibits States from making the private possession of ob-

omission in First Amendment law by citing *Tinker* v. *Des* *Moines School District* for the proposition that "students too are beneficiaries of this [right-to-receive] principle." *Ante,* at 868. But *Tinker* held no such thing. One may read *Tinker* in vain to find any recognition of a First Amendment right to receive information. *Tinker,* as already mentioned, was based entirely on the students' right to *express* their political views.

Nor does the right-to-receive doctrine recognized in our past decisions apply to schools by analogy. JUSTICE BRENNAN correctly characterizes the right of access to ideas as "an inherent corollary of the rights of free speech and press" which "follows ineluctably from the *sender's* First Amendment right to send them." *Ante,* at 867 (emphasis in original). But he then fails to recognize the predicate right to speak from which the students' right to receive must follow. It would be ludicrous, of course, to contend that all authors have a constitutional right to have their books placed in junior high school and high school libraries. And yet without such a right our prior precedents would not recognize the reciprocal right to receive information. JUSTICE BRENNAN disregards this inconsistency with our prior cases and fails to explain the constitutional or logical underpinnings of a right to hear ideas in a place where no speaker has the right to express them.

JUSTICE BRENNAN also correctly notes that the reciprocal nature of the right to receive information derives from the fact that it "is a necessary predicate to the *recipient's* mean-

---

scene material a crime, and *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), held that the right of privacy prohibits States from forbidding the use of contraceptives. Finally, *Martin* v. *Struthers,* 319 U. S. 141 (1943), held that the First Amendment protects the door-to-door distribution of religious literature.

JUSTICE BRENNAN's concurring opinion appears in a case which considered the constitutionality of certain postal statutes. *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965).

ingful exercise of his own rights of speech, press, and political freedom." *Ibid.* (emphasis in original). But the denial of access to ideas inhibits one's own acquisition of knowledge only when that denial is relatively complete. If the denied ideas are readily available from the same source in other accessible locations, the benefits to be gained from exposure to those ideas have not been foreclosed by the State. This fact is inherent in the right-to-receive cases relied on by JUSTICE BRENNAN, every one of which concerned the complete denial of access to the ideas sought.[7] Our past decisions are thus unlike this case where the removed books are readily available to students and nonstudents alike at the corner bookstore or the public library.

## B

There are even greater reasons for rejecting JUSTICE BRENNAN's analysis, however, than the significant fact that we have never adopted it in the past. "The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests, has long been recognized by our decisions." *Ambach* v. *Norwick*, 441 U. S. 68, 76 (1979). Pub-

---

[7] In *First National Bank of Boston* v. *Bellotti, supra,* public access to corporate viewpoints on ballot issues not directly affecting the corporations was foreclosed by the Massachusetts law prohibiting corporate expenditures to express such viewpoints. In *Kleindienst* v. *Mandel, supra,* the Court noted that the potential recipients of Mandel's ideas were completely deprived of the "particular qualities inherent in sustained, face-to-face debate, discussion and questioning." 408 U. S., at 765. The Georgia law in *Stanley* v. *Georgia, supra,* criminalized all private possession of obscene material, and the statute in *Griswold* v. *Connecticut, supra,* criminalized all use of contraceptive devices or actions encouraging the use of such devices. The ordinance at issue in *Martin* v. *Struthers, supra,* forbade all door-to-door distribution of religious literature, while the statute challenged in *Lamont* v. *Postmaster General, supra,* required persons receiving Communist propaganda in the mails affirmatively to state their desire to receive such mailings.

lic schools fulfill the vital role of teaching students the basic skills necessary to function in our society, and of "inculcating fundamental values necessary to the maintenance of a democratic political system." *Id.*, at 77. The idea that such students have a right of access, *in the school*, to information other than that thought by their educators to be necessary is contrary to the very nature of an inculcative education.

Education consists of the selective presentation and explanation of ideas. The effective acquisition of knowledge depends upon an orderly exposure to relevant information. Nowhere is this more true than in elementary and secondary schools, where, unlike the broad-ranging inquiry available to university students, the courses taught are those thought most relevant to the young students' individual development. Of necessity, elementary and secondary educators must separate the relevant from the irrelevant, the appropriate from the inappropriate. Determining what information *not* to present to the students is often as important as identifying relevant material. This winnowing process necessarily leaves much information to be discovered by students at another time or in another place, and is fundamentally inconsistent with any constitutionally required eclecticism in public education.

JUSTICE BRENNAN rejects this idea, claiming that it "overlooks the unique role of the school library." *Ante*, at 869. But the unique role referred to appears to be one of JUSTICE BRENNAN's own creation. No previous decision of this Court attaches unique First Amendment significance to the libraries of elementary and secondary schools. And in his paean of praise to such libraries as the "environment especially appropriate for the recognition of the First Amendment rights of students," *ante*, at 868, JUSTICE BRENNAN turns to language about *public* libraries from the three-Justice plurality in *Brown* v. *Louisiana*, 383 U. S. 131 (1966), and to language about universities and colleges from *Keyishian* v. *Board of Regents*, 385 U. S. 589 (1967). *Ante*, at 868. Not only is his

authority thus transparently thin, but also, and more importantly, his reasoning misapprehends the function of libraries in our public school system.

As already mentioned, elementary and secondary schools are inculcative in nature. The libraries of such schools serve as supplements to this inculcative role. Unlike university or public libraries, elementary and secondary school libraries are not designed for freewheeling inquiry; they are tailored, as the public school curriculum is tailored, to the teaching of basic skills and ideas. Thus, JUSTICE BRENNAN cannot rely upon the nature of school libraries to escape the fact that the First Amendment right to receive information simply has no application to the one public institution which, by its very nature, is a place for the selective conveyance of ideas.

After all else is said, however, the most obvious reason that petitioners' removal of the books did not violate respondents' right to receive information is the ready availability of the books elsewhere. Students are not denied books by their removal from a school library. The books may be borrowed from a public library, read at a university library, purchased at a bookstore, or loaned by a friend. The government as educator does not seek to reach beyond the confines of the school. Indeed, following the removal from the school library of the books at issue in this case, the local public library put all nine books on display for public inspection. Their contents were fully accessible to any inquisitive student.

### C

JUSTICE BRENNAN's own discomfort with the idea that students have a right to receive information from their elementary or secondary schools is demonstrated by the artificial limitations which he places upon the right—limitations which are supported neither by logic nor authority and which are inconsistent with the right itself. The attempt to confine the right to the library is one such limitation, the fallacies of which have already been demonstrated.

As a second limitation, JUSTICE BRENNAN distinguishes the act of removing a previously acquired book from the act of refusing to acquire the book in the first place: "[N]othing in our decision today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools. [O]ur holding today affects only the discretion to *remove* books." *Ante,* at 871–872 (emphasis in original). If JUSTICE BRENNAN truly has found a "right to receive ideas," *ante,* at 866–867, however, this distinction between acquisition and removal makes little sense. The failure of a library to acquire a book denies access to its contents just as effectively as does the removal of the book from the library's shelf. As a result of either action the book cannot be found in the "principal locus" of freedom discovered by JUSTICE BRENNAN. *Ante,* at 868.

The justification for this limiting distinction is said by JUSTICE BRENNAN to be his concern in this case with "the suppression of ideas." *Ante,* at 871. Whatever may be the analytical usefulness of this appealing sounding phrase, see Part II–D, *infra,* the suppression of ideas surely is not the identical twin of the denial of access to information. Not every official act which denies access to an idea can be characterized as a suppression of the idea. Thus unless the "right to receive information" and the prohibition against "suppression of ideas" are each a kind of Mother-Hubbard catch phrase for whatever First Amendment doctrines one wishes to cover, they would not appear to be interchangeable.

JUSTICE BRENNAN's reliance on the "suppression of ideas" to justify his distinction between acquisition and removal of books has additional logical pitfalls. Presumably the distinction is based upon the greater visibility and the greater sense of conscious decision thought to be involved in the removal of a book, as opposed to that involved in the refusal to acquire a book. But if "suppression of ideas" is to be the talisman, one would think that a school board's public announcement of its refusal to acquire certain books would have every bit as much

impact on public attention as would an equally publicized decision to remove the books. And yet only the latter action would violate the First Amendment under JUSTICE BRENNAN's analysis.

The final limitation placed by JUSTICE BRENNAN upon his newly discovered right is a motive requirement: the First Amendment is violated only "[i]f petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed." *Ante*, at 871 (emphasis in original). But bad motives and good motives alike deny access to the books removed. If JUSTICE BRENNAN truly recognizes a constitutional right to receive information, it is difficult to see why the reason for the denial makes any difference. Of course JUSTICE BRENNAN's view is that intent matters because the First Amendment does not tolerate an officially prescribed orthodoxy. *Ante*, at 870–872. But this reasoning mixes First Amendment apples and oranges. The right to receive information differs from the right to be free from an officially prescribed orthodoxy. Not every educational denial of access to information casts a pall of orthodoxy over the classroom.

It is difficult to tell from JUSTICE BRENNAN's opinion just what motives he would consider constitutionally impermissible. I had thought that the First Amendment proscribes content-based restrictions on the marketplace of ideas. See *Widmar* v. *Vincent*, 454 U. S. 263, 269–270 (1981). JUSTICE BRENNAN concludes, however, that a removal decision based solely upon the "educational suitability" of a book or upon its perceived vulgarity is "'perfectly permissible.'" *Ante*, at 871 (quoting Tr. of Oral Arg. 53). But such determinations are based as much on the content of the book as determinations that the book espouses pernicious political views.

Moreover, JUSTICE BRENNAN's motive test is difficult to square with his distinction between acquisition and removal. If a school board's removal of books might be motivated by a desire to promote favored political or religious views, there is

no reason that its acquisition policy might not also be so motivated. And yet the "pall of orthodoxy" cast by a carefully executed book-acquisition program apparently would not violate the First Amendment under JUSTICE BRENNAN's view.

D

Intertwined as a basis for JUSTICE BRENNAN's opinion, along with the "right to receive information," is the statement that "[o]ur Constitution does not permit the official suppression of *ideas.*" *Ante,* at 871 (emphasis in original). There would be few champions, I suppose, of the idea that our Constitution *does* permit the official suppression of ideas; my difficulty is not with the admittedly appealing catchiness of the phrase, but with my doubt that it is really a useful analytical tool in solving difficult First Amendment problems. Since the phrase appears in the opinion "out of the blue," without any reference to previous First Amendment decisions of this Court, it would appear that the Court for years has managed to decide First Amendment cases without it.

I would think that prior cases decided under established First Amendment doctrine afford adequate guides in this area without resorting to a phrase which seeks to express "a complicated process of constitutional adjudication by a deceptive formula." *Kovacs v. Cooper,* 336 U. S. 77, 96 (1949) (Frankfurter, J., concurring). A school board which publicly adopts a policy forbidding the criticism of United States foreign policy by any student, any teacher, or any book on the library shelves is indulging in one kind of "suppression of ideas." A school board which adopts a policy that there shall be no discussion of current events in a class for high school sophomores devoted to second-year Latin "suppresses ideas" in quite a different context. A teacher who had a lesson plan consisting of 14 weeks of study of United States history from 1607 to the present time, but who because of a week's illness is forced to forgo the most recent 20 years of American history, may "suppress ideas" in still another way.

I think a far more satisfactory basis for addressing these kinds of questions is found in the Court's language in *Tinker* v. *Des Moines School District*, where we noted:

> "[A] particular symbol—black armbands worn to exhibit opposition to this Nation's involvement in Vietnam—was singled out for prohibition. Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." 393 U. S., at 510–511.

In the case before us the petitioners may in one sense be said to have "suppressed" the "ideas" of vulgarity and profanity, but that is hardly an apt description of what was done. They ordered the removal of books containing vulgarity and profanity, but they did not attempt to preclude discussion about the themes of the books or the books themselves. App. 140. Such a decision, on respondents' version of the facts in this case, is sufficiently related to "educational suitability" to pass muster under the First Amendment.

## E

The inconsistencies and illogic of the limitations placed by JUSTICE BRENNAN upon his notion of the right to receive ideas in school are not here emphasized in order to suggest that they should be eliminated. They are emphasized because they illustrate that the right itself is misplaced in the elementary and secondary school setting. Likewise, the criticism of JUSTICE BRENNAN's newly found prohibition against the "suppression of ideas" is by no means intended to suggest that the Constitution permits the suppression of ideas; it is rather to suggest that such a vague and imprecise phrase, while perhaps wholly consistent with the First Amendment, is simply too diaphanous to assist careful decision of cases such as this one.

I think the Court will far better serve the cause of First Amendment jurisprudence by candidly recognizing that the role of government as sovereign is subject to more stringent limitations than is the role of government as employer, property owner, or educator. It must also be recognized that the government as educator is subject to fewer strictures when operating an elementary and secondary school system than when operating an institution of higher learning. Cf. *Tilton* v. *Richardson*, 403 U. S. 672, 685–686 (1971) (opinion of BURGER, C. J.). With respect to the education of children in elementary and secondary schools, the school board may properly determine in many cases that a particular book, a particular course, or even a particular area of knowledge is not educationally suitable for inclusion within the body of knowledge which the school seeks to impart. Without more, this is not a condemnation of the book or the course; it is only a determination akin to that referred to by the Court in *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 388 (1926): "A nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard."

### III

Accepting as true respondents' assertion that petitioners acted on the basis of their own "personal values, morals and tastes," App. 139, I find the actions taken in this case hard to distinguish from the myriad choices made by school boards in the routine supervision of elementary and secondary schools. "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). In this case respondents' rights of free speech and expression were not infringed, and by respondents' own admission no ideas were "suppressed." I would leave to another day the harder cases.

JUSTICE O'CONNOR, dissenting.

If the school board can set the curriculum, select teachers, and determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it. As JUSTICE REHNQUIST persuasively argues, the plurality's analysis overlooks the fact that in this case the government is acting in its special role as educator.

I do not personally agree with the Board's action with respect to some of the books in question here, but it is not the function of the courts to make the decisions that have been properly relegated to the elected members of school boards. It is the school board that must determine educational suitability, and it has done so in this case. I therefore join THE CHIEF JUSTICE's dissent.